UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. __7:23cv00454__ |
| ) | |
| APPROXIMATELY $71,980.00 IN ) | |
| U.S. CURRENCY, ) | |
| ) | |
| Defendant. ) | |

**AFFIDAVIT OF TASK FORCE OFFICER STEVEN M. KAHLE**

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) since April 2019. Currently, I am assigned to the DEA Resident Office Group 34 in Winchester, Virginia. Prior to my current assignment, I was assigned as an investigator to the Northwest Virginia Regional Gang and Drug Task Force (NVRGDTF). I have been a Deputy Sheriff with the Frederick County (Virginia) Sheriff's Office since 2008.

3. As a sworn law enforcement officer in the Commonwealth of Virginia, I have completed a sixteen-week basic training course at the Rappahannock Regional Criminal Justice Academy. During this time, I learned the methods narcotics traffickers use to manufacture, package, sell, and conceal controlled substances. I also learned about the source countries and source cities for different types of controlled substances and the various methods used by narcotics

traffickers to transport controlled substances from source countries and source cities to and within different parts of the United States.  Additionally, I learned about narcotics trafficking conspiracies and the different roles that individuals play in these conspiracies.

4. While assigned to the NVRGDTF from 2012 until 2019, I investigated multijurisdictional narcotics conspiracy cases in Virginia; orchestrated controlled purchases of narcotics; and developed, managed, and debriefed confidential informants. I performed as an undercover officer making undercover purchases of heroin, LSD, ecstasy, cocaine, crack cocaine, methamphetamine, and prescription pills.  Additionally, I have written affidavits in support of search warrants and court orders for persons, physical premises, vehicles, cell phones, cell phone records, and location data, to include cell phone GPS data and vehicle trackers. During this time, I conducted regular debriefs of confidential informants, narcotics users, and narcotics traffickers. Also during this time, I participated in Title III wire intercept investigations by monitoring the electronic wire intercept and conducting surveillance related to information gathered from wire intercepts.

5. As a DEA TFO, I have participated in multiple criminal investigations of Title 21 violations and received additional training.  In early 2020, I attended training on Title III wiretaps, which was sponsored by the DEA's Washington Division.  I have testified under oath in criminal matters and in front of the Grand Jury.  I have been involved in investigations that have resulted in the arrests and convictions of numerous individuals responsible for narcotics trafficking.  I have been involved in complex, cross-jurisdictional investigations into large-scale narcotics trafficking organizations.  As a result, I have experience in debriefing criminal defendants, witnesses, and other people with direct experience in the methods used to distribute controlled substances.  Through the course of these investigations I have experience in money laundering through various

means such as bulk cash smuggling, crypto currencies, and wire fraud, and the means and ways in which traffickers utilize currency and the banking system to transport, launder and hide proceeds from illicit means. Based on training and experience, I know that drug traffickers are known to keep proceeds of illegal drug trafficking on their persons, in their vehicles, or inside residences where they feel the proceeds are safe from others and law enforcement.

6. Additionally, as a DEA TFO, I have written affidavits in support of search warrants and court orders for persons, physical premises, vehicles, cell phones, cell phone records, and location data, to include cell phone GPS data and vehicle trackers, and Title III wiretaps. Finally, as a DEA TFO, I have participated in Organized Crime Drug Enforcement Task Force (OCDETF) investigations. The OCDETF program is part of the United States Attorney General's drug strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint-agency collaboration.

7. The facts and information contained in this affidavit are based upon information from other agents and officers. All observations not personally made by me were relayed to me by the individuals who made them or were conveyed to me by my review of records, documents, and other evidence obtained during the course of this investigation. This affidavit contains information necessary to support a complaint relating to the forfeiture of $71,980.00 U.S. Currency ("THE SUBJECT PROPERTY") seized from Reuben E. Dixon in Frederick County Virginia, on January 26, 2023, that was proceeds of illegal activities in violation of 21 U.S.C. §§ 841 and 846.

8. As set forth in detail below, THE SUBJECT PROPERTY is forfeitable pursuant to 21 U.S.C. § 881(a)(6) as a thing of value constituting proceeds, facilitating property, and/or property furnished or intended to be furnished in exchange for a controlled substance.

**Probable Cause**

9. On January 26, 2023, Deputy Davis with the Frederick County Sheriff's Office conducted a traffic stop at approximately 1:37 a.m. on a vehicle that was traveling north on Interstate 81 in Frederick County, Virginia. Deputy Davis observed this vehicle swerving in and out of its lane several times. Deputy Davis then initiated a traffic stop of the vehicle for suspicion of DUI.

10. Upon initiating Deputy Davis's emergency equipment, the vehicle promptly pulled over. Deputy Davis made contact with the lone occupant (the driver) and identified him as Reuben Dixon via a New York driver's license. The vehicle, a 2013 black Beamer, was not registered to Dixon or the state of New York. The vehicle had temporary Georgia license plates and was registered to an individual in California, not Dixon.

11. Deputy Davis asked Dixon where he was traveling from, and Dixon advised he was coming from Roanoke, Virginia, back to his residence in New York after attending a family reunion in Roanoke. He stated he left Roanoke around 11:00 p.m. in order to get his daughter on the school bus by 8:00 a.m.

12. Deputy Davis also asked Dixon if he had anything to drink, and Dixon stated that he does not drink or smoke. Unprompted, Dixon then showed Deputy Davis his diabetes medication. Deputy Davis also asked Dixon whether he had done anything fun in Roanoke, to which Dixon responded that he did not and that he does not drink or smoke.

13. Deputy Davis then asked Dixon whether there was anything illegal in the vehicle, to which Dixon responded, "No, no, you can search it, I give you consent to search."

14. Deputy Davis then requested assistance to search the vehicle and confirmed with Dixon that he was giving Deputy Davis consent to search his vehicle. Deputy Miles then arrived on the scene to assist with the search.

15. When searching the vehicle, the Deputies noticed multiple empty voids in the center console and dash of the vehicle. From my training and experience, I know these voids are consistent with hiding or concealing narcotics or large amounts of currency for purchasing narcotics. While searching the vehicle, the deputies noted a lack of luggage in the vehicle that would have been consistent with someone who was traveling and staying overnight.

16. As deputies continued to search the vehicle, they located a plastic grocery bag on the floor in the rear of the vehicle containing a square shaped object with a firm texture. An open box of dryer sheets was next to the grocery bag. The square shaped object was a vacuum sealed bag, which was covered in another grey plastic bag. I know from my training and experience that drug traffickers will place large amounts of currency inside a vacuum sealed bag to hide the scent of drugs on the currency. I also know from my training and experience that drug traffickers will place strongly scented items, such as dryer sheets, next to currency to disguise the smell of the currency and narcotics on the currency.

17. Looking at this vacuum sealed pack it was clear the currency inside was separated into stacks with small various colored rubber bands. Additionally, deputies located paper towels that were sprayed with cologne or other type of aromatic masking agent inside of the grocery bag with the vacuum pack of currency. I know from training and experience that drug traffickers will use dryer sheets, rags, paper towels or tissues sprayed with cologne, perfume, deodorant or other types of fragrant spray to attempt to mask the odor of narcotics from police narcotics canines.

18. The deputies then told Dixon that he was being detained and read him his Miranda Warning at 1:58 a.m. Dixon told the deputies the plastic grocery bag contained U.S. currency. He then changed his story as to the reason he was in Roanoke. Instead of attending a family reunion, he told the deputies he had gone to Roanoke to collect money from his family to purchase racehorses. When asked how much money was in the plastic bag, Dixon stated he did not know. The deputies asked Dixon if there were any drugs in the vehicle, to which Dixon responded no.

19. The deputies asked Dixon why the cash was packaged in a vacuum sealed bag and with dryer sheets. Dixon responded that his family said it was packaged that way "incase the money sniffing dogs could smell it from when they had smoked weed around the money."

20. Deputy Miles then called DEA Task Force Officer (TFO) Steven Kahle of the Winchester Resident Office (WRO) to inform him of the traffic stop and the large amount of currency identified. TFO Kahle then requested a K-9 Unit to respond to the scene as well. TFO Kahle and DEA TFO William Foster then reported to the scene and arrived at approximately 3:45 a.m.

21. Deputy Suire and his narcotics canine, Canine Majlo, from the Frederick County Sheriff's Office also arrived. Canine Majlo is a three-year old German Shepherd trained in narcotic detection, tracking missing and wanted persons, and apprehension of offenders. Majlo received sixteen weeks of training in detecting the following narcotic odors: cocaine, ecstasy, heroin, and methamphetamine. Majlo receives additional training bi-monthly and is recertified yearly.

22. Deputy Suire had his narcotics canine conduct an open-air sniff around the vehicle, and it positively alerted to the presence of narcotics on the driver's side of the vehicle in which

Dixon was driving.[1] Specifically, Majlo is trained to give an aggressive alert when locating the presence of an odor of narcotics, meaning he will display indications towards the source and provide a scratch and/or bite in that area. This is the indication Majlo gave on the driver's side of the vehicle Dixon was driving.

23. TFO Foster and TFO Kahle interviewed Dixon. Dixon stated that the currency was to purchase racehorses and that he keeps his horses at multiple stables. TFO Kahle asked Dixon how many horses he has, and he stated "zero". TFO Kahle asked Dixon when the last time he purchased a horse and he stated, "three or four years ago". Dixon advised TFO Kahle that the name of his stable was "Day One syndicate". A google search for "Day One Syndicate" does not reveal any horse stables or any websites related to horse racing.

24. Dixon also told TFO Foster that he had obtained the money from friends and family members in Roanoke, Virginia, not just from family as he told the deputies. TFO Foster then asked Dixon for the names of his friends and family as well as anyone else who could make a claim on the money in an attempt to determine where the money had come from. Dixon stated that they all go by aliases. Dixon told TFO Foster that they all have the same last name of Dixon and then stated one individual had the first name of "Robert", and that Robert was his cousin. Dixon did not know the last name, address, or phone number for his relative Robert. Dixon told TFO Foster that he did not know how much money Robert gave him or where Robert lived except in Roanoke and that other family and friends contacted Robert and arranged where to meet Dixon. Dixon was not able to tell TFO Foster who all had provided money to Robert but stated it was packaged the way it was so that a police canine would not smell it. Dixon did not explain why he was concerned about

---

[1] Later at the DEA Winchester Resident Office, K-9 Deputy Suire performed a sniff of the vacuum sealed cash (still vacuum sealed and placed in a sealed evidence envelope and box) and he did not alert to the box.

7

a canine potentially smelling the money. Upon speaking to Dixon further, Dixon told TFO Foster Dixon met Robert in the parking lot of a Food Lion in Roanoke to obtain the money, and that the address of the location was possibly in Dixon's cell phone, but Dixon was unable to otherwise provide the address of the Food Lion. When TFO Foster asked for consent to search Dixon's cell phone, Dixon denied consent and invoked his rights to have an attorney present. At this time, questioning of Dixon stopped.

25.     Dixon was not arrested and no criminal charges have been filed against him related to this traffic stop at this time.

26.     TFO Khale seized the U.S. currency, placing the vacuum sealed package in an evidence bag.

27.     TFO Khale also seized Dixon's cell phone to possibly seek a search warrant to review the contents of the phone, but a search warrant has not been sought to date.

**Money related to controlled substances**

28.     I am aware from my training and experience that controlled-substance proceeds and/or money intended to be furnished in exchange for controlled substances are often found in multiple places to include, vehicles, residences and on individuals.  The packing of the money and the attempts to disguise the odor of the money are consistent with money used in drug trafficking. Further, the narcotics canine hit on the driver's side for the presence of a narcotic odor is indicative of drug trafficking. Based on Dixon's own penal interest statements, the observations by law enforcement, and the packing of the money, the $71,980.00 in U.S. Currency was proceeds of selling controlled substances and/or money intended to be furnished in exchange for controlled substances and is therefore forfeitable under 21 U.S.C. § 881(a)(6).

## CONCLUSION

29.  Based on the foregoing information, I believe probable cause exists to forfeit the seized $71,980.00 in U.S. currency. I submit that probable cause exists to believe that the subject property is forfeitable under 21 U.S.C. § 881(a)(6), as currency and other things of value constituting proceeds, facilitating property, or property furnished or intended to be furnished in exchange for a controlled substance.

_____
Steven M. Kahle, Task Force Officer
Drug Enforcement Administration